UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RENEE L. HAHNEL,

                                  Plaintiff,                    DECISION AND ORDER

        -v-
                                                                08-CV-6310 CJS

UNITED STATES OF AMERICA,

                                  Defendant.


APPEARANCES

For Plaintiff:                    Paul D. Kelly, Esq.
                                  Davidson Fink LLP
                                  28 East Main Street, Suite 1700
                                  Rochester, New York 14614-1990

For Defendant United
States of America:                John J. Field, AUSA
                                  Office of the United States Attorney
                                  for the Western District of New York
                                  100 State Street, Room 620
                                  Rochester, New York 14614


INTRODUCTION

        This is an action under the Federal Tort Claims Act ("FTCA"),  arising from a motor

vehicle accident ("MVA") allegedly caused by an employee of the United States Postal

Service ("USPS").  Now before the Court is a motion [#35] for summary judgment  by the

United States, and a cross-motion [#38] for  summary judgment by Plaintiff.   For the

reasons that follow, both applications are granted in part and denied in part.

1

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case.  On March 3, 2007, Renee Hahnel ("Plaintiff") was driving her car, and made a left turn out of Panorama Plaza, in the Town of Penfield, New York, and proceeded west on Penfield Road, which is a four-lane road, with two lanes in each direction.  Plaintiff was driving in the left or inside lane of the two westbound lanes.  Prior to Plaintiff leaving the plaza parking lot and entering Penfield Road, she observed a USPS van sitting at the exit of "another parking lot across the street," to the west of her location. (Pl. Dep. at 24-25).  At that moment, Susan Kazak ("Kazak"), the USPS employee who was operating the postal van, was stopped at the exit of the parking lot, eating a snack. Kazak Dep. at 41.  Plaintiff traveled approximately forty feet on Penfield Road, and was preparing to stop at a red light, when Kazak drove her van out of the parking lot where she had been stopped, and attempted to make a left-hand turn across the oncoming lanes of traffic in which Plaintiff was traveling.  Kazak drove her van directly into the front passenger-side of Plaintiff's car. Kazak admits that she never saw Plaintiff's car before she exited the parking lot, and that she only saw Plaintiff's car an instant before impact, which gave her enough time to apply her brakes. Kazak Dep. at 42, 49.

Kazak indicated that she did not know where Plaintiff's car "came from." *Id*. at 42. Despite this, or because of it, Kazak assumes that Plaintiff must have sped up and caused the accident:

> A. I believe she was speeding when she – when I pulled out of the post office and [that she] was trying to get by me.  I pulled out into the lane and I believe that she was speeding and tried to outrun my truck.

Q. I thought you testified that you never saw her before impact?

A. I didn't.

Q. Okay.

A. But the rate of her speed.

Q. Did you see her at all before the impact?

A. A car length.  When you're – when you're pulling out, a car length.  No.
I did not see her.

(Kazak Dep. at 49).  Upon impact, Plaintiff, who was wearing a seatbelt, struck her head against the interior of her car.  Plaintiff declined medical treatment at that time.  Following the accident, both vehicles were operable, and Plaintiff drove herself home.

For some years prior to the accident, Plaintiff had received medical treatment for complaints of pain in her hands, wrists, and back.  Between September 27, 2002 and March 31, 2003, Plaintiff was treated by Leslie S. Weisbrod, M.D. ("Weisbrod"), an internist.  Plaintiff complained to Weisbrod of pain in her hands and wrists, and stiffness in her hands and back.  Plaintiff never complained to Weisbrod about leg pain or focal back pain, and Weisbrod found nothing on his examinations to suggest that Plaintiff had "any type of spinal condition or disc disease." (Weisbrod Aff. ¶ 6).  Weisbrod referred Plaintiff to a rheumatologist.

Gordon L. Moore, M.D. ("Moore") is another internist who treated Plaintiff between May 2001 and April 18, 2007.  Prior to the MVA, Plaintiff complained to Moore about pain in her hands, elbows, knees, and back, "but did not complain of any specific back problem." Moore Aff. at ¶ 3.  According to Moore, "[t]he systemic and generalized joint pain and inflammation Plaintiff presented with [was] characteristic of a rheumatologic condition,"

3

and he referred Plaintiff to a rheumatologist. *Id*.  On May 19, 2003, Moore examined Plaintiff, at which time Plaintiff was not working, due to joint pain, primarily in her wrists, neck, back, and jaw. Def. Summary Judgment Motion Ex. 7 at p. 17.  Plaintiff reported having difficulty bending and lifting, and indicated that she could sit for about 30-45 minutes before needing to stand, and could stand for about 30-45 minutes before needing to sit. *Id*.  In October 2005, Moore reported that Plaintiff's "rheumatologic problems" were "continu[ing] with little relief.  She is in pain a lot of the time, feeling fatigued most of the time, nothing seems to be working for her." *Id*. at 32.   Moore excused Plaintiff from work, for "medical reasons," between October 14, 2005 and November 1, 2005. *Id*. at 34.   In February 2006, Plaintiff complained to Moore of sharp pain in her back, "located about six (6) inches above her waist," which Plaintiff felt "was related to her ongoing joint pain." *Id*. at ¶ 5.

On March 6, 2007, a few days after the MVA, Moore examined Plaintiff, who complained of headaches and  "back pain, focused in her low back." *Id*. at ¶ 7.  At that time, Plaintiff had "severely restricted" thoracic and lumbar flexion. *Id*.  Moore reported, though, that Plaintiff had negative straight-leg raising bilaterally, and that she was able to stand on the balls of her feet and her heels, without difficulty. Def. Summary Judgment Motion, Ex. 7, Bates No. 48.  On March 14, 2007, Plaintiff told Moore that she was having pain, which she attributed to whiplash, and "tingling in her hands and down her leg," and she "asked about [having] an MRI." *Id*. at 51.  Moore told Plaintiff that an MRI would be "a waste of her time," since there was "an absence of muscular symptoms that would raise suspicion of a protruding disc." *Id*.  Subsequently, on April 18, 2007, Plaintiff told Moore

4

that she had "pain in her mid to lower back that traveled down her right leg to her toes," as well as numbness in her leg. Moore Aff. at ¶ 8.  According to Moore, "[b]efore the accident, Plaintiff did not have focal back pain, rather she had generalized joint inflammation and pain.  After the accident, she described back pain that radiated down her right leg; Plaintiff never described to me any such radiating pain prior to the accident." *Id*. at ¶ 8.

Keith Pryhuber, M.D. ("Pryhuber") was the rheumatologist to whom Weisbrod and Moore referred Plaintiff.  Pryhuber treated Plaintiff between February 4, 2003 and March 4, 2008, which covers the period before and after the  MVA.  Prior to the accident, Plaintiff complained of joint pain, "particularly in her elbows, knees, back, and neck." (Pryhuber Aff. ¶ 3).  Pryhuber's impression was that Plaintiff possibly had "connective tissue disease," such as Lupus or mild inflammatory arthritis. *Id*.  Inflammatory arthritis can include spondyloarthropathy, which is inflammatory arthritis of the spine. *Id*.  Prior to the MVA, Pryhuber did not see any symptoms or conditions to suggest to him that Plaintiff was suffering from "spinal disc disease." Pryhuber Aff. at ¶ 4.  In that regard, Plaintiff never told Pryhuber that she was experiencing "nerve root symptoms originating in her  back such as pain shooting  down her legs." *Id*. at ¶ 6.  However, in July 2003, Plaintiff did inform Pryhuber that she was having numbness in her achilles tendon area. Def. Summary Judgment Motion Ex. 7 at p. 19.  In March 2004, Pryhuber reported that Plaintiff was taking the drug sulfasalazine for her "arthritis," without much improvement, and that she was still complaining of "problems with her hands, knees, ankles, [and] elbows." *Id*.  In July 2004, Pryhuber reported that Plaintiff's arthritis symptoms were significantly improved  since she began taking the drug methotrexate, though she was still experiencing "some pain in the

ankles and top of her foot." *Id*. at 21.  In November 2004, Pryhuber reported that Plaintiff's "inflammatory arthritis" was "a little better," though he was not sure why, since Plaintiff had stopped taking methotrexate and sulfasalazine. *Id*. at 25.  At that time, Plaintiff reported swelling and tenderness in her knees and ankles. *Id*.  Pryhuber placed Plaintiff back on sulfasalazine. *Id*.  In February 2005, Pryhuber reported that Plaintiff's joint symptoms seemed to "have settled down on sulfasalazine," and that her joints were "okay for the most part." *Id*. at 28.  However, Plaintiff complained of "mild tenderness in the right sacroiliac area." *Id*. ("Mild tenderness in the right sacroiliac area . . . . Still having pain in the sacroiliac joint on the right and less so on the left.")  Pryhuber reported that Plaintiff's sacroiliac pain might be associated with "inflammatory bowel disease." *Id*.  In June 2005 Pryhuber reported that Plaintiff was "still working" at her job as a dental technician, and was still having some swelling in her wrists and ankles. *Id*. at 29.  In August 2005, Plaintiff informed Pryhuber that she was having "very bad back pain," along with pain in her elbows and knees. *Id*. at 30.  In May 2006, Pryhuber reported that Plaintiff was doing "reasonably well," and was having "only mild discomfort in her hands on occasion," with no swelling in her knees or ankles. Def. Summary Judgment Motion, Ex. 7 at 41.  Subsequently, Pryhuber did not see Plaintiff until March 4, 2008, almost two years after her last appointment with him, and one year after her MVA. *Id*. at 42.[1]  Following the MVA, Pryhuber observed that Plaintiff "exhibited nerve root symptoms that result from a condition of the lumbar spine."

---

[1]On that date, Plaintiff reported that since she had seen Pryhuber last, and up until the time of the MVA, she had "reasonable control" over her "joint symptoms" by taking sulfasalazine. *Id*. Plaintiff stated, though, that after the MVA, she stopped taking sulfasalazine, and that she had subsequently experienced "more of the peripheral joint symptoms, including the feet, shoulders and less in the hands." *Id*.

Pryhuber Aff. at ¶ 7.

Before the MVA, neither Weisbrod, Moore, or Pryhuber believed that Plaintiff's back pain was caused by disc disease, and consequently they did not order diagnostic tests, such as an x-ray or MRI, nor did they refer Plaintiff to a back specialist.  After the MVA, Plaintiff received various diagnostic testing for her back, including x-rays, MRI, discogram, CT scan, and neurologic testing.  X-rays of Plaintiff's lumbosacral spine, taken on March 14, 2007, showed no fractures or dislocations.  On May 11, 2007, Michael Dunn, M.D. ("Dunn"), performed neurologic testing, and reported that Plaintiff was complaining "primarily of back pain that radiates down the posterolateral aspect of the right greater than left leg.  The pain goes all the way to her right big toe." Def. Summary Judgment Motion, Ex. 7 at 61.  Dunn also indicated that Plaintiff had a  "borderline positive straight leg raising test," and he described her as having "radicular sounding symptoms into the right greater than left leg." *Id*. at 63.  On May 24, 2007, MRI testing indicated, at L5-S1, "slight disc dessication with mild bulging into the subligamentous space, without significant sac distortion.  No focal nerve root impingement is seen." Def. SJ motion, Ex. 7 at 65.  The radiologist's conclusion was "essentially normal lumbosacral MRI other than minimal subligamentous disc protrusion at the lumbosacral junction without significant impingement/stenosis." *Id*.   On November 8, 2007, Miltonia Woluchem, M.D. ("Woluchem"), reviewed Plaintiff's MRI and noted, "On the right side, there seems to be a posterior disk bulge or contained protrusion in the right posterolateral region extending into

the foramen." *Id*. at  68.  Woluchem's impression was "traumatic[2] disk bulge, herniation right paracentral foraminal region." *Id*. at  69.

On December 12, 2007, Peter N. Capicotto, M.D. ("Capicotto"), a back surgeon, obtained a discogram of Plaintiff's spine, which showed, at L5-S1, "degenerative change with extravasation [leakage of injected contrast dye from the disc]."  A CT scan was performed following the discogram, which revealed, at L5-S1, bilateral posterolateral radial annular tears with nerve root exit zone extravasation [leakage of contrast dye] and epidural accumulation of contrast." Pl. Cross Motion, Ex. J, Capicotto Aff., Ex. A.

On January 13, 2008, Plaintiff completed an "Owestry Low Back Pain Disability Questionnaire," in which she indicated that she had severe pain, which came and went, and that such pain prevented her from lifting heavy weights, but not "light to medium weights." Def. Summary Judgment Motion, Ex. 7 at 70.  Plaintiff also stated that her pain prevented her from sitting or standing for more than thirty minutes. *Id*.

On March 24, 2008, Capicotto performed an "L5-S1 decompressive right dissectomy and foraminotomy," which involved fusing Plaintiff's L5 and S1 vertebrae, to relieve pressure on her nerve.  As part of that surgery, Capicotto "examined and excised the extruded disc at the entrance of L5-S1 foramin which was seen on the pre-surgery diagnostic studies." Capicotto Aff. at ¶ 7.  Capicotto indicated that Plaintiff's surgery was a complete success, but that nevertheless, she would have some permanent limitations,

---

[2]Plaintiff's surgeon, Dr. Capicotto, indicates that diagnostic scans do not indicate how an injury was caused, and specifically, they do not indicate whether an injury is "traumatic-related injury" or "degenerative injury or anything else." Capicotto Dep. at 36.  Capicotto states that the question of causation is determined by information provided by the patient. *Id*.

as well as some residual pain. Capicotto Dep. at 58.   Capicotto classified Plaintiff's limitations as "moderate disability; mild to moderate." *Id*.   At deposition, Capicotto indicated, based on his review of selected portions of Plaintiff's pre-MVA medical records,[3] that Plaintiff may have had disk pain, though not necessarily a herniation, prior to the MVA, Capicotto Dep. at 52, 78-79, and he expressed surprise that Plaintiff's doctors had not ordered diagnostic testing in response to her complaints of back pain.

Following discovery, Defendant filed the subject motion for summary judgment. Defendant maintains that it is entitled to summary judgment, since Plaintiff cannot establish that she suffered a "serious injury" from the MVA,  as defined by New York State's "No Fault Law."   Defendant argues that none of Plaintiff's doctors, including Capicotto, are willing to state, to a degree of medical certainty, that Plaintiff's disc injury was caused by the MVA.   Moreover, Defendant indicates that even if the disc injury was caused by the MVA, Plaintiff has not shown that the injury is sufficiently severe, based on the duration and extent of any limitations caused by the injury.   For example, Defendant indicates that Plaintiff's physical limitations following the MVA were essentially the same as before the accident.   Defendant further argues that none of Plaintiff's other injuries, including whiplash, head injury, and muscle spasm, amount to a "serious injury."   Additionally, Defendant states that Plaintiff cannot recover her alleged economic damages, since they total less than $50,000.

In support of its motion, Defendant submits an affidavit from its medical expert,

---

[3]*See*, Capicotto Dep. at 48, lines 23-25 (Defendant's counsel indicated that he was waiting to receive "additional records from the rheumatologist.")  From this, it is unclear whether Capicotto had any of Pryhuber's records at the time he was deposed.

Glenn R. Richtine, II, M.D. ("Rechtine"), an orthopedic surgeon specializing in the diagnosis and treatment of spine disorders. Def. Summary Judgment Motion, Ex. 12.   Rechtine maintains that the MVA did not cause Plaintiff to suffer a serious back injury:

> It is my opinion to a reasonable degree of medical certainty that the March 3, 2007, accident did not cause Hahnel to need surgery in her lower lumbar spine.   Instead, Hahnel's medical situation is the result of the continued natural progression of a pre-existing and ongoing symptomatic degenerative process in her lumbar spine.

*Id*. at ¶ 6.   Rechtine observes, for example, that Moore's findings during his post-MVA exam of Plaintiff on March 6, 2007, suggest that Plaintiff did not suffer a disc herniation or nerve root impingement as a result of the MVA. *Id*. at ¶ 8 ("The absence of radicular symptoms (pain in her legs) in response to the straight leg raise test is especially significant in this regard.")  Rechtine further indicates that Plaintiff's pre-MVA intermittent complaints of back pain, from 2003 onward, including the complaint of numbness in her Achilles tendon region, are consistent with a preexisting degenerative back problem. *Id*. at ¶¶ 11-13.   Moreover, Rechtine indicates that Plaintiff's post-MVA physical limitations are essentially the same as her pre-MVA condition. *Id*. at ¶ 15 (Indicating that Plaintiff's pre-MVA limitations, as assessed by Moore on May 19, 2003, were "almost identical to a post-accident assessment performed by Dr. Capicotto on January 13, 2008.")  In addition to Rechtine's affidavit, Defendant also relies heavily on Capicotto's deposition testimony, in which he indicated that he could not state, to a degree of medical certainty, that Plaintiff's disc injury was caused by the MVA, without first obtaining additional information from Plaintiff.

Plaintiff opposes Defendant's motion, and also cross-moves for summary judgment,

on the issues of serious injury, causation, and negligence.[4]  Plaintiff maintains that a back injury which requires surgery, such as Plaintiff's, is a "serious injury" as a matter of law. On this point, Plaintiff states that, according to Capicotto, the injury is serious and permanent, and results in Plaintiff having a mild-to-moderate disability.  Plaintiff also contends that Plaintiff's disc injury was caused, at least in part, by the MVA.  In this regard, Plaintiff maintains that the MVA "triggered" the need for her spinal surgery.[5]  Plaintiff also indicates that prior to the MVA, she did not have focal low-back pain or sciatica, such as she experienced after the MVA.  Plaintiff states that, although she experienced some back pain prior to the MVA, such pain was due to spondyloarthropathy, not disc disease, and that such spondyloarthropathy was successfully treated with sulfasalazine.  Lastly, Plaintiff maintains that she is entitled to summary judgment on the issue of negligence, since Kazak admittedly failed to observe Plaintiff before she pulled into traffic, and failed to yield the right of way to Plaintiff.

In support of her cross-motion, Plaintiff submits, *inter alia*, an affidavit from Capicotto.  In his affidavit, Capicotto states that, subsequent to his deposition in this action, he had further discussions with Plaintiff, and also reviewed the complete pre-MVA medical notes of Weisbrod, Moore, and Pryhuber.  Capicotto states that, based on the additional information that he learned following his deposition, that Plaintiff's sciatica is "new":

---

[4]Plaintiff contends that the only issue remaining for trial is damages.

[5]Plaintiff alleges that Capicotto's opinion, that the MVA triggered the need for Plaintiff to have surgery, establishes a "serious injury" "as a matter of law." Pl. Memo of Law [#38] at 8. Plaintiff further states that "[t]he proof is undisputed that the accident was *a cause* of the low back injury that necessitated surgery." *Id*. (emphasis added).  Plaintiff's memo of law [#38], though, does not mention Rechtine's opinion, even though Plaintiff's statement of facts admits that Rechtine and Capicotto disagree regarding the cause of Plaintiff's injury. Pl. Stmt. of Facts [#38-3] at ¶ 8.

11

> My review of these medical records and the Declarations of the doctors who treated Ms. Hahnel before the accident lead me to believe that, based on her pre-accident complaints and also the noted degenerative changes, the patient had pre-existing disease and her back ache was most likely connective tissue related. Her sciatica, however, is more likely new because it was not recorded in her medical records prior to the [MVA].
>
> It is my opinion, based upon this additional information, that Ms. Hahnel sustained in the March 3, 2007 motor vehicle accident a serious injury to her low back. I cannot render an opinion to a reasonable degree of medical certainty apportioning all of the injury to the March 3, 2007 motor vehicle accident. I reiterate, however, my February 25, 2009 deposition testimony 'that the motor vehicle accident in some form or fashion, was the 'trigger' that culminated in the need for lumbar spinal fusion surgery.

Capicotto Aff. ¶ ¶ 10-11. Capicotto further states that Plaintiff "will always be prone to a chronic backache or frank back pain and the need for future intervention by way of modification of activity, physical therapy, possibility of bracing or injections, and even the possibility of further surgery." *Id*. at ¶ 13.

Defendant, in its reply, states, first, that except for her back injury, Plaintiff does not claim to have a serious injury. Consequently, Defendant contends, Plaintiff admits that her head and neck injuries are not serious, and that she does not meet the 90/180 day standard. Additionally, Defendant states that Plaintiff has not shown that her alleged mild-to-moderate partial disability is the result of the MVA, as opposed to being the result of her pre-existing conditions. *See*, Def. Reply Memo at 4 ("Because plaintiff has submitted no evidence that the accident resulted in a decreased range of motion in her low back, or an increased level of impairment and disability in her low back, she has failed to establish that her low back injury was a 'serious injury' caused by the accident.") Defendant also reiterates that Plaintiff cannot establish causation. On this point, Defendant contends that Capicotto's deposition testimony fails to establish causation. *See, id*. at 6-7 ("Dr.

12

Capicotto's lack of awareness concerning [Plaintiff's complete medical records] renders his testimony speculative, and plaintiff may not rely upon it as admissible evidence of causation.")  Defendant also argues that the Court should disregard Capicotto's affidavit submitted in support of Plaintiff's cross-motion, for two reasons.  First, Defendant states that Capicotto's affidavit contradicts his deposition testimony, wherein he indicated that he could not testify, at that time, to a reasonable degree of medical certainty, about causation. Second, Defendant states that the opinions contained in Capicotto's affidavit constitute expert opinion, since they were not formulated in connection with his treatment of Plaintiff, but instead, were formulated as part of this litigation.  Defendant further maintains that such expert opinion was not disclosed as required by Fed. R. Civ. P. 26.   Finally, Defendant argues that the Court should deny Plaintiff's cross-motion for summary judgment, because it is untimely, and because Plaintiff's negligence caused the MVA.  As for the timeliness of the cross-motion, a Scheduling Order required that all dispositive motions be filed by December 4, 2009, and Plaintiff's cross-motion was filed on June 21, 2010.   As to Plaintiff's alleged negligence, Defendant cites Kazak's deposition testimony, in which she speculates that Plaintiff must have sped up prior to the MVA. Def. Reply Memo at 12 ("According to the Postal Service driver involved in the accident, she believed that plaintiff was speeding and tried to outrun the Postal Service truck at the uncontrolled intersection where the accident occurred.").

Plaintiff also submitted a reply memo of law.  Plaintiff indicates that her cross-motion was timely, since it was submitted in opposition to Defendant's timely-filed motion.  Plaintiff also states that Kazak's "speculation" that Plaintiff was speeding is insufficient to defeat

summary judgment on the issue of negligence.

DISCUSSION

*The Summary Judgment Standard*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), cert denied, 517 U.S. 1190 (1996). Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions,

14

must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

*The FTCA and New York's No Fault Law*

It is undisputed that in resolving this case, the Court must apply the substantive law of the State of New York:

> Under the FTCA, the federal government waives its sovereign immunity to suits stemming from the negligent acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Because the accident occurred in New York, New York law applies.

*Rambarrat v. U.S.*, No. 06-1805-cv, 227 Fed.Appx. 82, 83, 2007 WL 1965416 at *1 (2d Cir. Jul. 5, 2007) (unpublished).

New York Insurance Law § 5104(a) states, in pertinent part, that in motor vehicle negligence cases, "there shall be no right of recovery for non-economic loss, except in the case of a serious injury." In this regard, New York Insurance Law defines "serious injury" as follows:

> "Serious injury" means a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which

constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

Insurance Law § 5102(d). "Under New York's no-fault law, a plaintiff can recover non-economic losses related to an injury sustained in a motor vehicle accident only if he can present competent, nonconclusory expert evidence sufficient to support a finding, not only that the alleged injury is 'serious' within the meaning of Insurance Law § 5102(d), but also that the injury was proximately caused by the accident at issue." *Rambarrat v. U.S.*, 227 Fed.Appx. at 83, 2007 WL 1965416 at *1 (unpublished, citation and internal quotation marks omitted). Additionally, Insurance Law § 5104(a) states that in motor vehicle negligence cases, "there shall be no right of recovery for . . . basic economic loss," which the statute defines as economic loss less than $50,000.00. *See, Dendy v. U.S.*, No. 5:07-CV-242 (FJS/GJD), 2009 WL 890618 at *2 (N.D.N.Y. Mar. 30, 2009) ("'Basic economic loss' essentially consists of medical expenses, loss of earnings and other 'reasonable and necessary' expenses up to $50,000 per person.") (citation omitted). Thus, the no-fault law bars claims for injuries that are not "serious," and claims for economic loss less than $50,000.

In this case, it is clear that both parties' motions for summary judgment on the issue of "serious injury" must be denied, since there is an issue of fact as to causation. Capicotto indicates that even if Plaintiff's herniated disk existed prior to the MVA, it was non-symptomatic with regard to any radicular symptoms, and that the MVA caused Plaintiff's radicular symptoms and necessitated surgery. Rechtine, meanwhile, indicates that Plaintiff's radicular symptoms and surgery were not caused by the MVA, but were instead

the result of a pre-existing degenerative process.   Therefore, there is an issue of fact precluding summary judgment.  Defendant maintains, though, that there is no such issue, since the Court should disregard Capicotto's affidavit.  Specifically, Defendant contends that Plaintiff failed to comply with Fed.R.Civ. P. 26(a)(2)(B), by not providing "the required written expert report." Def. Reply Memo at 11; *see also, id*. at 10 (Stating that Capicotto's affidavit was "made after reviewing plaintiff's records and re-interviewing her concerning her history," and that Capicotto "reviewed this information, not to treat plaintiff, but in order to render an opinion on causation in this case.").

However, the Court declines to disregard Capicotto's affidavit.  At the outset, the Court observes that the 1993 Advisory Committee notes to Rule 26(a)(2) carve out an exception for treating physicians who provide opinion testimony:

> The requirement of a written report in paragraph (2)(B), however, applies only to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony.  *A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report.*

(emphasis added).  However, this exception is limited:

> The plain language of [Rule 26(a)(2)] only requires a written report for a witness retained or specially employed to provide expert testimony in the case, or whose duties as a party's employee regularly involve the giving of expert testimony. As explained in the Advisory Committee Notes, this language excludes treating physicians. . . . Thus, to the extent that a treating physician testifies only to the care and treatment of the patient, the physician is not considered to be a "specially employed" expert and is not subject to the written report requirements of Rule 26(a)(2)(B), "notwithstanding that the witness may offer opinion testimony under [the Federal Rules of Evidence]." *Wreath v. United States*, 161 F.R.D. 448, 450 (D.Kan.1995). However, when the doctor's opinion testimony extends beyond the facts disclosed during care and treatment of the patient and the doctor is specifically retained to develop opinion testimony, he or she is subject to the provisions of Rule

17

26(a)(2)(B).

*Salas v. U.S.*, 165 F.R.D. 31, 33 (W.D.N.Y. 1995) (citation omitted).

In this case, Capicotto formed an opinion regarding causation during the course of his treatment of Plaintiff, which was that Plaintiff's disc injury was caused by the MVA. This is the same opinion that Capicotto asserts in his affidavit. The only difference is that, after being provided with a portion of Plaintiff's medical records by Defendant, Capicotto has now had an opportunity to review Plaintiff's entire medical record and to speak with Plaintiff. *See, Bengtson v. Bazemore*, 2007 WL 3307204 at *2 (M.D. Ala. Nov. 6, 2007) (Treating physicians who reviewed reports of other doctors in formulating an opinion as to causation of their patient's condition were not thereby required to provide an expert report); *but see, Riddick v. Washington Hosp. Ctr.,* 183 F.R.D. 327, 331 (D.D.C. 1998) ("[I]f it turns out that Dr. Mines was requested to review medical records of another health care provider in order to develop an opinion for the litigation of this matter rather than having reviewed the records on her own in 1994 in order to provide treatment, she will not be permitted to give her opinion as to causation and injury.")  Capicotto did not review the other doctors' medical records in order to learn the doctors' opinions, or to formulate an opinion regarding the sufficiency of their treatment of Plaintiff, or even to form his own opinion as to causation in the first instance. Rather, Capicotto was interested in learning what subjective complaints his patient had made to her other doctors, in order to determine whether his previously-formed opinion as to causation was correct.

Defendant opened the door to such opinion evidence when it provided Capicotto with some, but not all, of Plaintiff's medical records, and asked him whether such evidence

18

caused him to reconsider his opinion regarding causation.   In response to Defendant's questioning, Capicotto indicated that if Plaintiff had not complained of pain radiating down her leg prior to the MVA, then he would continue to believe that the MVA caused her radicular symptoms and her need for surgery.   This is essentially the same opinion that Capicotto reiterates in his affidavit, after reviewing Plaintiff's medical records, all of which had already been disclosed to Defendant.   Therefore, even assuming *arguendo* that Plaintiff should have provided Defendant with an expert report from Capicotto, her failure to do so was harmless, and Defendant was not prejudiced. *See*, Fed.R.Civ.P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information . . .  unless the failure was substantially justified or is harmless."); *Ebewo v. Martinez*, 309 F.Supp.2d 600, 607 (S.D.N.Y. 2004) ("The purpose of [Rule 37(c)(1)] is to prevent the practice of 'sandbagging' an opposing party with new evidence.   Courts in this Circuit recognize that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with discretion and caution.") (citations and footnote omitted)  Consequently, the Court declines Defendant's request to strike Capicotto's affidavit, and finds that there are triable issues of fact as to the  cause of Plaintiff's back injury.

Plaintiff, however, has not opposed other aspects of Defendant's motion. Specifically, Plaintiff does not contend that her head, neck (whiplash), and muscle spasm injuries are "serious injuries," or that she meets the 90/180 day criteria.   Nor does Plaintiff dispute that her economic damages are less than $50,000.   Accordingly, Defendant is entitled to summary judgment on those aspects of Plaintiff's case.   Plaintiff's sole claim is

for non-economic loss related to her disc injury.

Before considering the remaining aspects of Plaintiff's cross-motion, the Court declines Defendant's invitation to disregard Plaintiff's cross-motion as untimely.  In that regard, Courts in this circuit have deemed cross-motions untimely when they were made after a court-imposed deadline for filing motions. *See, e.g., Tackman v. Goord*, No. 99-CV-0438A(F), 2005 WL 2347111 at *35-36 (W.D.N.Y. Sep. 26, 2005) (Recommending that cross-motion be denied as untimely, where it was not made by the court-imposed deadline for filing dispositive motions) (Report and Recommendation; never adopted, as case settled).  Moreover, Defendant is correct that the deadline for filing dispositive motions was December 4, 2009, and that Plaintiff filed her cross-motion after that date. In fact, Plaintiff did not even file her cross-motion by the deadline which the Court set for Plaintiff to respond to Defendant's motion, which was  May 5, 2010. (Amended Motion Scheduling Order [#37])  Instead, Plaintiff filed her cross-motion more than a month after that date, on June 21, 2010, without any explanation.  Therefore, the motion was clearly late.  Moreover, Plaintiff has not shown good cause for the delay.  Instead, in her reply papers, Plaintiff now states merely that she did not file a motion by the deadline, because she was "willing to have all the issues in this matter decided at trial." Pl. Reply Memo at 1. Plaintiff further states that "[t]he proper and complete response to [Defendant's motion was] to cross-move for summary judgment," and that "it is in the interests of justice that the Court hear and consider the [cross-motion] as it will likely narrow and focus the issue[s] to be tried." *Id*. at 1-2.  This Court has routinely permitted litigants to file a cross-motion in response to a dispositive motion, even though the deadline for filing dispositive motions

had passed, provided that such cross-motions were filed by the deadline established for filing opposing papers, as set by the Court's Motion Scheduling Order.  The Court cannot recall an instance, though, where a cross-motion was filed after all filing deadlines had expired, as in this case, and it notes its disapproval of the manner in which Plaintiff's motion was filed.   Nevertheless, the Court will, for its own convenience, and in its discretion, consider Plaintiff's cross-motion, because the issue of liability is clear, and because resolution of the cross-motion will narrow the issues that the Court will have to consider at the impending bench trial. *See, Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003) ("[A] scheduling order ruling under Federal Rule of Civil Procedure 16(b) is . . .  reviewed for abuse of discretion.")  The Court further observes that Defendant will not be prejudiced by this ruling.

Regarding the issue of negligence, the Court finds that Plaintiff has shown that Kazak was negligent as a matter of law; that such negligence was the sole proximate cause of the MVA; and, that Defendant has not raised a triable issue of fact.  The record indicates that Plaintiff had the right of way, and there is no indication that she was driving carelessly. Additionally, Plaintiff was entitled to anticipate that Kazak would obey the traffic law and yield the right of way. *See, Yelder v. Walters*, 64 A.D.3d 762, 764, 883 N.Y.S.2d 290, 292 (2d Dept. 2009) ("Regardless of which vehicle entered the intersection first, Francis, as the driver with the right-of-way, was entitled to anticipate that the plaintiff would obey traffic laws which required her to yield.")  Kazak failed to yield the right of way, and her speculation that Plaintiff was speeding is insufficient to create a triable issue of fact. *See, Falcone v. Ibarra*, 67 A.D.3d 858, 859, 889 N.Y.S.2d 238, 238-239 (4th Dept. 2009)

21

("The assertions made by the defendant in her opposing affidavit that the vehicle operated by the plaintiff was traveling at an excessive rate of speed when it entered the intersection were speculative and, thus, insufficient to raise a triable issue of fact.") (citations omitted). Accordingly, Plaintiff is entitled to summary judgment on the issue of negligence.

CONCLUSION

Defendant's motion for summary judgment [#35] and Plaintiff's cross-motion for summary judgment [#38] are both granted in part and denied in part.  Defendant's motion is denied insofar as it sought a determination that Plaintiff's disc injury is not a "serious injury" resulting from the MVA, but is otherwise granted.  Plaintiff is granted judgment on the issue of Defendant's negligence, but her cross-motion is otherwise denied.

SO ORDERED.

Dated:        March 15, 2011
              Rochester, New York

                              ENTER:


                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge